Please the court, counsel. My name is D.J. Wessling and I'm here on behalf of Debbie Masten on appeal of Judge Jackson's decision on her 2255 alleging a Brady violation. We understand that the court hears many, many Brady cases. We believe they're all fact-intensive, but we believe that this case is different because on direct appeal of this case, the Eighth Circuit stated that the government's evidence indicated that Masten left the bar as the last person on the night of the fire. Through the motion hearing for the 2255, Debbie Masten has been able to show through her expert that she was not the last person to leave the bar that night. Her expert was able to show that there are images on the original security tape that show other people approached the bar after she left that night. It is that evidence of the original security tape that was not given to Ms. Masten. Counsel, Brady usually involves evidence that's been not disclosed or obscured or hidden. That seems different than here. Here, the original tape was always present and known and it was disclosed. How is the fact that a copy was supplied and the copy was described as being not a really good one a Brady violation when counsel could have requested and obtained the original? Because the original tape is really not available. To this day, it has not been played. The DVD copy of the original tape does not include all of the images on the original tape. There's a finding to the contrary. We believe it's erroneous, Judge. Clear error. What's the evidence that the detention center's original was not available to defense counsel prior to trial? That it was unavailable to be played. Even the government could not play the tape. Nobody played it and couldn't have gotten a copy. Ms. Masten's expert went to the ATF with his own equipment and took still pictures of the original VHS tape. I'm not talking about the ATF, I'm talking about the county detention center. Those were the people that had the original, right? The Adair County Sheriff's Department. Yes, that's where the government got. For trial, it is our understanding that Agent Zorns of the ATF went to the Adair County Jail and couldn't make a copy of the original multiplex security system, which was on a VHS tape. He did not have the equipment to show that at trial. He was instructed to go up there and make a copy of it so that it was easily played at trial. But defense counsel could have done all this. No, I don't believe that defense counsel could have done that. Well, what's the evidence that defense counsel couldn't have gone to the detention center with a subpoena if needed and accessed their original just as the government investigators did? First of all, he was only advised of the availability of any surveillance tape a week before trial and didn't have the ability. You know, that happens all the time. Well, but it's like giving him a lot. That's what motions for continuance are all about. It's like giving him a locked box if he has no way to view it. No, he never talked to the detention center, did he? I don't believe so. I don't know, Judge. No, but that's what we're talking about when availability. But it has to be coupled with the representations of the government made to defense counsel that this was an exact copy of the original tape, which it wasn't. I mean, we're really into young blood country here, not Brady country. Well, when the government advised defense counsel that he could come and pick up a DVD copy of this, he was told that it was an exact copy of the original tape, which it wasn't. I thought he was told it's poor quality. It's poor quality, but it's an exact copy. But it wasn't because there are images. No, there are images on the original tape that were not picked up on the DVD copy. That's what poor quality is all about. No, Agent Zorns selected certain camera images from this multi-camera security system to put onto the DVD that he made when he went up there. He did not capture everything that was on the original tape. That's why we have an adversary system, because government investigators frequently do what's convenient and or helpful to the government. Justice shouldn't be based on just convenience. No, but that's why we have an adversary system, so that the opposing advocate. I mean, I think probably what happened here, and it's the reason we don't have an ineffective assistance appeal, is there was no hint anywhere else in the record that would have alerted a defense counsel that there might be these mystic shadows in a better quality thing that an expert might be able to say, I think that's another person. Not until Debbie Mastin's expert was able to get access to the original VHS tape was that possible. So there was no ineffective assistance because a reasonable counsel was not alerted to the need to go do what the expert did after the fact. That's neither a Brady violation nor a Youngblood violation nor a Strickland violation. I mean, there it is, isn't it? In the case law, we're bound to apply. Well, we've asserted that it's a Brady violation. But I don't understand what the prosecutor did wrong. He did not provide a copy, an exact copy of the original tape. To this day, it still has not been provided. The district court in ruling says for purpose of this motion, I have to decide whether he should have asked for the original. I just have to decide whether he could have and whether it was available to him, and it was. That's the decision we're reviewing. And it's our position that it's not available if he can't see it. Counsel, what's the evidence that someone couldn't have obtained the appropriate equipment to view the original? Well, even at the 2255 hearing, the government was unable to provide equipment to view this. It's somewhat antiquated technology. Well, I know we've moved on in technology, but if it's VHSC, which is the little compact ones from the cameras that you have to get an adapter for, it seems it wouldn't take, that that's not outside of what could be done to obtain a viewing for the purposes of showing the court what's on that tape. Well, I think that Dr. Edwards' report and, in fact, the government's witness, Mr. Green, indicates that this is complex technology and that it gets very degraded. You described it as VHS. Was it VHS or was it the little VHSC that are more difficult to find equipment for? I honestly don't know, Judge. I believe it's referred to in the record as a VHS tape, and I know that there were multiple cameras that were all fed into one system. And that's my best recollection of it. We believe that this case is complicated by the government's representation to defense counsel that this was, in fact, an exact copy, when we believe the defendant's expert shows that it was not. That there are 13 seconds . . . What's the quote, please, that you're . . . So read it from the record. It is in . . . Exactly what the finding is that the prosecutor said. I'm referring to trial counsel, Mr. Hogue's representation to defense counsel at trial, that it was an exact copy, and that is in . . . At trial, but we're talking about this is all pretrial. This was pretrial, yes, sir. I'm sorry. What is the exact statement when the horrible tape was delivered? What was the exact representation by the prosecutor, who obviously had not seen anything other than what he was delivering? Right. It is in Doug Forsythe's affidavit, which is in, I believe, the appellee's appendix. Who was he? He was the trial counsel. Defense counsel. Defense counsel, yes. What did the prosecutor say? That it was an exact copy, but it was poor quality. What did the prosecutor say, he said? What did the prosecutor say? Yes. I don't have . . . This is 2255. Did we have a hearing on this? We did have a hearing on this. All right. What did the prosecutor testify, he said, with delivery? That he was providing a copy, a poor quality copy. Okay. So stop saying exact. I believe that Doug Forsythe . . . Was it a . . . A misrepresentation that could be linked into the Brady concept. That was not a misrepresentation. Right. Okay. So the prosecutor is clean here. The prosecutor didn't look at the original that now would have saved the day for your client, and the prosecutor accurately represented what was being delivered in discovery. Yes, but he did not . . . Where is the Brady claim, as opposed to Youngblood or something else? That there are 13 seconds, which we outline on . . . I mean, I know that the . . . You know Youngblood. That's a mistake by a government investigator involved, but not a prosecutor, as to which there has to be a lot more rigorous showing than simply it was exculpatory and I didn't get it. Yes, sir. So I don't see the Brady. I mean, I understand the problem after the fact. Gee, wouldn't this have been nice? Well, those 13 seconds that were not on the DVD that was provided by the government to the defense counsel are crucial to what Ms. Mastin could have shown. She could have shown just the original VHS tape to the jury to show that she was, in fact, not the last person at the bar that night. I thought it was quite disputable whether the original, in fact, shows someone else or papers blowing in the wind or something else. Judge Jackson found just from the still images that she was able to see that Mastin's expert had taken that the images on the original are much clearer than the images on the DVD provided by the government. Would an expert have been required as well to testify that that image on the original constitute the presence of another person or only a suspicion that perhaps another person was there? Not necessarily. We believe that if she had just been able to show the jury the original VHS tape, the jury could have made an assessment of whether or not Ms. Mastin was the last person at the bar or not. I mean, obviously experts would have helped in this case, Ms. Mastin, but if the government had just played the original security system tapes as opposed to trying to make it convenient, we believe that it would have shown that she was not the last person at the bar. And the failure to do that . . . So what would have required them to show the original when they had an accurate copy? It's our position that it wasn't accurate. And notify the other side of the existence of the original. I think that's where we're having our dispute. It's that we don't believe it's an accurate copy of what was on the original tapes. Judge Jackson did find that the information that we cited in the 2255 was, in fact, exculpatory. Again, we are appealing her ruling that it was not withheld. We believe that it was withheld because it was not given to the defense in a way that it could be used. So, therefore, we are asking that her decision be reversed with instructions to grant appellant a new trial. Thank you. May it please the Court. Mr. Marston. Let me at the outset indicate that we have in our brief indicated that we have in our brief indicated that there is a procedural default based on the failure to appeal the first motion for new trial. The difficulty with that theory is that the 2255 was pending at the time the new trial was denied, and the new trial denial was then incorporated into the 2255 decision, right? Yes. That's very different than the procedural default cases you cite. Then I'll move on. Well, I'm not saying . . . It is an issue, but that seems to me to be a serious difference in this case. Well, as this Court . . . And I want to discuss a couple of things. As this Court has indicated, there is no Brady violation. There was no newly discovered evidence. As Judge Jackson correctly pointed out, it's just newly examined evidence. There was no deliberate, inadvertent, or otherwise attempt to hide or secrete or withdraw that tape from Mr. Forsythe and the defense. The tape was made available. He knew it was available. That's why he made the best evidence objection at trial, saying the best evidence is the tape. Why that equipment wasn't used is because it's not portable. It's in the Adair County Jail, and you can't take it out and bring it with you. It's built into the Adair County Sheriff's Department, so we had to make a copy. Now, could we have gotten another machine to do it? That's possible. All we sought to do was to make a copy that was a fair and accurate representation of the original. Does the record show what the technology was? What kind of tape was this? Multiplex VHS system, which contains 16 cameras that operated in four-second intervals. There were 16 cameras, but for this purpose and to answer what she's talking about, Zorn's only selected certain ones where there were only two cameras, the Sally Port camera and a pole camera that depicted the side of the street and the restaurant itself and the streets involved, which was Missouri Avenue and Elson Avenue and the parking lot next to it. Those were the only two cameras, so he didn't take the other. How was the expert able to view the original? I'm sorry? How was the expert able to view the original? Way beyond my pay level on video. I can turn them on, but that's about it. I don't know the answer to that. Did he do it at the detention center? No. We originally took the original exhibit. We put it into evidence along with the DVD copy and had testimony that that's a fair and accurate copy of the original. My agent and my expert both looked at both of them and said those are fair and accurate representations. And I represented to Doug Forsythe that it's a copy of it, but it's not very good. It's of very poor quality, which is what I told him. And at the time, I wasn't even thinking about using it. It was only as I got prepared for trial that I said, well, I might be able to use it for the timeline to show when people are coming out because although you can't see, they're pretty shadowy figures, you can see movement. You can see the cars leaving. And there was a time stamp that you could then fix as to who was leaving where, and people testified to that. Their motion, which they used Dr. Edwards saying he can prove evidence on that tape that they should have had, would be exculpatory. Well, it's not exculpatory, and it's not what Dr. Edwards said. What he said and what he provided is completely different from what the tapes, even the poor degraded, they call it, tape shows. They allege in the exculpatory that photos would show Mastin walking from the back of the restaurant to the parking lot. Well, they offered no evidence of that. They offered none, okay? They said that the photographs, enhanced photographs, would show that Trooper Berry drove down Elson and went in front of the restaurant. Well, the photos don't show that. As a matter of fact, four people testify about Berry says he went down Elson and turned onto Missouri Avenue where he went to osteopathy. Brandon Watson, who found the fire, was at osteopathy turning onto Missouri Avenue when he saw Trooper Berry parked at that location. There's two workers who were jailers, Claybrook and Rogers, who were out having a smoke near the Sally Port, and they observed that Trooper go down Missouri Avenue and not down Elson as alleged in there. They have, when they offered, they offered like three enhancements, and two of which you just talked about, which I want to talk about and show you how erroneous it is. One of those is 793, image 793, saying, and the allegation is that Mastin left the parking lot. Let me just stop you a minute on this argument. I didn't see a finding one way or another on exculpatoriness by the district court. District court said for purposes of this hearing. There's no Brady violation. No Brady violation. Because it was available. But what she did say, Judge, okay, what she did say was for purposes of this hearing, I'm going to assume that what the doctor would have showed me would be exculpatory. Right, okay. Now, is that being the case? Right. If Ms. Westling's theory is accepted on appeal, would our proper disposition would be to order a new trial or to remand for a hearing and a finding on exculpatoriness? It certainly wouldn't be to order a new trial. Well, that was just what was asked for. But it seems to me that, I mean, it's one thing to impeach Berry and so forth, but the real heft of this evidence, as alleged to us, is that we have shadowy figures coming to the about-to-be-burned restaurant that would be a real, establish a real defense, and that would require finding, wouldn't it? Yes. As to whether that was, A, does it show that? Well. And if it does, is that sufficiently exculpatory to warrant a new trial? As I said for the record. That wasn't in that short circuit what you want to talk to us about analyzing. Okay. I don't need to go through that. We shouldn't analyze these. I'm not saying don't do it because my colleagues might not agree, but it seems to me you are maybe putting the cart before the horse if you want to convince us that it wasn't exculpatory. You're probably right. What is important is on the record, okay, my agent, my expert examined the doctor's findings and what he said, and I said on the record, look, I'm not going to be able to, she cut the thing short and said, I don't need an expert to tell me that these are better than those. So I'm going to assume that it was exculpatory. I don't think it rises to the level to undermine confidence in the verdict. And I'm going to deny the motion for a new trial. And we went on the record saying, look, we by no means concede that what the doctor says is what is shown on the video because it doesn't. So I'm not going to go any further than that. I just want to make it for the record. For 13 seconds, I won't go through that. This was a circumstantial evidence case, as you know. All arson cases are circumstantial. It's almost impossible to get somebody on the match. And in this case, even though the Court of Appeals characterized it as close, it was an exactly strong circumstantial evidence case. And there was means, motive, opportunity. When you talk about maybe there's a possibility that someone else did it, if you look at all the circumstances, her financial situation, the restaurant situation, and you add all that up, you know that, first of all, the doors were locked when they arrived. So if someone else did it, how did they get in and how did they get out without a key? And the six to seven minute period of time from the time she left to the time that the fire was found by Brandon Watson is sufficient time for everything to have happened. Is the so-called Brady violation linked to the ineffective assistance claim? I don't think so. I mean, it was part of the pleading. They pled both the ineffective assistance and the Brady violation. But they were substantially identical to the Brady violation allegations in the criminal case. In the first one, on the newly discovered evidence and Brady claim. Any other questions? Thank you. Thank you. Ms. Westling, you have some time? Yes, a little over a minute. Thank you, Judge. We want the record to be clear. We're not trying to disparage Mr. Hogue and the representations that he made to defense counsel. He believed he was giving a true and accurate copy to defense counsel, but the evidence that Mastin was able to present in the 2255 shows that that was, in fact, not the case. Because of the technology involved in this matter and the degradation that happens when you switch from one medium to another, we believe that the government bore greater burden under Brady to make it truly available. This was not notes that might have been available for anybody to go look at. It's a different medium. Thank you. And is there a case that supports that? Judge, the closest one that we could find was the one we cited in our brief. It's Buckley, B-U-C-H-L-I. Thank you. Thank you, counsel. The case has been well briefed and argued. We'll take it under advisement.